# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Julie Kay Mapson,

   Plaintiff,

v.

Carolyn W. Colvin,
Acting Commissioner of
Social Security,

   Defendant.

Civ. No. 14-1257 (SRN/BRT)

**REPORT AND
RECOMMENDATION**

---

Daniel L. McGarry, Esq., Collins, Buckley, Sauntry, and Haugh, PLLP, counsel for
Plaintiff.

Pamela A. Marentette, Esq., Assistant United States Attorney, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

  Plaintiff Julie Kay Mapson appeals the final decision of the Commissioner of

Social Security ("the Commissioner") denying her applications for disability insurance

benefits and supplemental security income. The parties filed cross-motions for summary

judgment. (Doc. Nos. 20, 23.) This matter is referred to the undersigned for a Report and

Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons

stated below, this Court recommends that Plaintiff's motion be denied and Defendant's

motion be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff filed both a Title II application for disability insurance benefits and a

Title XVI application for supplemental security income on September 13, 2012. (Tr. 9.)[1]

The Social Security Administration ("SSA") denied Plaintiff's applications on December

7, 2012, and again on reconsideration on April 3, 2013. (*Id*.) At Plaintiff's request, a

hearing was held before an Administrative Law Judge ("ALJ") on October 29, 2013. (*Id*.)

The ALJ denied Plaintiff's applications on December 9, 2013, and the Social Security

Appeals Council denied her request for review on February 21, 2014. (*Id*. at 1–5, 22.)

The Appeals Council's denial rendered the ALJ's decision the final decision of the

Commissioner. *See* 20 C.F.R. § 404.981.

Plaintiff filed this action on April 24, 2014, seeking judicial review under 42

U.S.C. § 405(g). (Doc. No. 1.) The parties thereafter filed cross-motions for summary

judgment. (Doc. Nos. 20, 23.)

## II.    Factual Background

Born December 28, 1965, Plaintiff was forty-three years old on her alleged

disability onset date of May 31, 2009. (Tr. 63.) Plaintiff completed high school and one

year of college in 1985. After completing a travel academy in 1990, Plaintiff worked in

the travel industry. (*Id.* at 223, 240.) Her last job was "team lead" in corporate travel

management. (*Id.* at 223.) In that position she managed a team of twenty-three

---

[1]     Throughout this Report and Recommendation, the abbreviation "Tr." is used to
reference the Administrative Record (Doc. No. 8).

employees, handled clients, talked on the phone, used a computer, and participated in meetings. (*Id.* at 223–24.) Plaintiff was laid off on May 31, 2009, due to a downturn in the economy. (*Id.* at 223.)

### A. Medical History

Plaintiff alleged that the following conditions limited her ability to work: back injury, back pain, neck pain, restless leg syndrome, sleep apnea, depression, and anxiety. (*Id.* at 222.) The summary below addresses the conditions subject to Plaintiff's appeal and are organized by condition.

### i. Back Condition and Chronic Pain

Plaintiff experienced a whiplash injury in 1996 and again in 1998. (Tr. 459.) Apparently, the onset of her pain began in September 2003. *(Id.* at 316.) Medical records from 2005 reference a "back injury in January 2003 after an installation." (*Id.* at 501.) She was seen for examination in 2004, following a "flare up" of pain and onset of numbness. (*Id.* at 459.) Her physician noted, "She does not know of anything in particular that brought on this flare up. There has been no recent accident or injury although apparently the initial origin of the low back pain was a workman's comp injury." (*Id.* at 459.) Plaintiff had back surgery in January 2005. (*Id.* at 303.) She "did fine for about 14 months" but began to have low back pain again in 2006. (*Id.* at 456.) In October 2007, Plaintiff complained of neck pain consisting of numbness and tingling that extended into her right arm. (*Id.* at 454.) Her physician recommended a magnetic resonance imaging exam ("MRI") and a follow-up electromyography ("EMG") test. (*Id.* at 454, 453.)

Plaintiff went to the emergency room at Abbott Northwestern hospital on October 8, 2009, reporting significant pain which she rated "10 out of 10" in severity. (Tr. 597.) She was admitted and had a right L2-3 microdiscectomy[2] the next day. (*Id*. at 310-11.) She was discharged with instructions not to drive for a week and was placed on a ten-pound lifting restriction. (*Id.* at 589.)

During her four-week post-operative consultation, Plaintiff reported to a clinic at the hospital. (Tr. 305.) The pain she had suffered in her low back was almost entirely gone with the exception of some mild discomfort in her right thigh. (*Id.*) Her lifting tolerances were initially increased to fifteen to twenty pounds with another increase to twenty-five to thirty pounds four weeks thereafter. (*Id.* at 306.) Plaintiff was also instructed that she could increase her activities at home if she was comfortable. (*Id.*) Plaintiff began physical therapy, which she tolerated well, but exhibited limited motion with pain and weakness following her microdiscectomy. (*Id.* at 619, 623.)

During her two-month post-operative consultation in December 2009, Plaintiff was still in no apparent distress or discomfort. (Tr. 303.) She expressed that she was recovering well. (*Id.*) The pain in her lower back was almost fully gone and any remaining discomfort was improving on a weekly basis. (*Id.*) She had weaned off all pain medication, her gait and balance were smooth and steady, and she was walking without difficulty. (*Id.*) Her lifting restriction was raised to thirty to thirty-five pounds for the next

---

[2] A microdiscectomy is a surgical procedure that involves removing a portion of the intervertebral disc that is herniated or protruding and compressing the traversing spinal nerve root. *Microdiscectomy: Overview and Indications*, USC Center for Spinal Surgery, http://www.uscspine.com/treatment/microdiscectomy.cfm (last visited June 26, 2015).

four weeks, after which she could return to activity without restrictions if she continued to feel well. (*Id.* at 304.) She did not request disability paperwork at her post-operative evaluation in November and December 2009. (*Id.* at 303, 306.)

In June 2010, Plaintiff sought an evaluation for multi-level pain throughout her back, right shoulder, neck, right groin, right buttock, right hip, and right leg. (Tr. 316.) Plaintiff exhibited "frequent pain behaviors." (*Id.* at 318.) Her musculoskeletal system was normal except for "mild greater trochanter tenderness present with palpation." (*Id.* at 319.) Nevertheless, her muscle strength, mobility, and joint range of motion were all normal. (*Id.* at 319–21.) She was started on Neurontin for her neuropathic pain and a lumbar epidural steroid injection was recommended. (*Id.* at 324.) She was referred to physical therapy. (Id. at 323.)

After receiving the steroid injection in July 2010, Plaintiff's pain was reduced from a severity rating of "7 out of 10" down to "4 out of 10." (Tr. 326, 328.) A few days later, she underwent an MRI, which revealed "a small to moderate sized disc protrusion . . . indenting the ventral dural sac and abutting the ventromedial aspects of the traversing L4 nerve root sleeves," and "[h]emilaminotomy and microdiscectomy changes . . . evident at L2-L3, L3-L4, and L4-L5." (*Id.* at 329, 491, 564.) After the MRI, Plaintiff continued to report pain, which she described as "sharp, burning, throbbing, and aching." (*Id.* at 331.) She noted that sitting, standing, walking, lifting, doing housework, and making transitional movements all increased the pain. (*Id.*) Physical therapy was recommended one to two times a week. (*Id.* at 333.)

Plaintiff's low back pain continued following her steroid injection. (Tr. 334–35.) She continued to rate her pain at "7 out of 10" and under poor control. (*Id.* at 334.) Plaintiff exercised by walking her dog and attending physical therapy. (*Id.* at 340.) Her gait, muscle tone, and mobility were normal when examined. (*Id.* at 336.) Toward the end of July 2010, Plaintiff continued to rate her pain at "7 out of 10." (*Id.* at 347.) Her Neurontin dosage was increased in addition to her use of Percocet and Tizanidine. (*Id.* at 349.) She noted no side effects from her medications. (*Id.* at 348.)

In August 2010, Plaintiff received a second lumbar epidural steroid injection. (Tr. 352–55.) After the injection her pain decreased from a "7 out of 10" to a "4 out of 10"; however, the effects of the injection only lasted one week, after which Plaintiff again complained that her pain had returned and increased to "9 out of 10." (*Id.* at 355, 357, 363.) She reported that Neurontin, Percocet, and Tizanidine helped manage her pain. (*Id.* at 363.) Near the end of the month, Plaintiff rated her pain "8 out of 10." (*Id.* at 368.) A physical examination noted that her mobility was normal but that she exhibited frequent pain behaviors. (*Id.* at 369.) Physical therapy was continued and Plaintiff was prescribed Cymbalta to assist with her inadequate pain control. (*Id.* at 371.) Plaintiff noted that her physical therapy was helpful. (*Id.* at 373.)

In September 2010, Plaintiff received a third lumbar epidural steroid injection. (Tr. 375.) Her pain went from an "8 out of 10" down to a "4 out of 10." (*Id.* at 378.) She also received an EMG, which revealed that her "right tibial and peroneal nerves [were] normal with the exception of borderline reduced motor amplitude in the right hand tibial nerve." (*Id.* at 380–81.) The test revealed "no significant evidence of an active

radiculopathy, nerve root irritation or peripheral nerve difficulty" and that her "right leg pain [was] likely consistent with the ongoing pathology in the lumbar region." (*Id.* at 382.) Approximately two weeks later, Plaintiff received a fourth lumbar epidural steroid injection; this time, the injection did not lower her pain. (*Id.* at 388–89.) Plaintiff was described as exhibiting frequent pain behaviors and her mobility was characterized as "difficult[] secondary to pain." (*Id.* at 392.) Her Cymbalta dosage was increased for further neuropathic pain control. (*Id.* at 393.) Toward the end of September 2010, Plaintiff underwent a diagnostic lumbar medial branch block procedure.[3] (*Id.* at 396–98.) The procedure initially reduced her pain from a severity of "7 out of 10" to "4 out of 10"; however, she later reported that her pain returned to "6 out of 10." She stated that the multiple injections and branch blocks were not helpful. (*Id.* at 397, 399.) Spinal Cord Stimulation ("SCS") therapy was discussed and prior insurance authorization for a SCS trial was sought. (*Id.* at 400, 403.)

Plaintiff continued her medical appointments while awaiting authorization from her insurance company. (Tr. 402.) In October 2010, Plaintiff rated her pain as "8 out of 10." (*Id.*) While her mobility and muscle tone were normal, her gait was slow and painful. (*Id.* at 404.) Her Cymbalta dosage was increased again. (*Id.*) In November, her mobility, gait, and muscle tone were normal; however, she was still exhibiting frequent pain behaviors. (*Id.* at 409.)

---

[3]     A lumber medial branch block procedure is a spinal injection in which a small dose of steroid medicine is injected into specific areas of the spine. *Spinal Injections*, USC Spine Center, http://spine.keckmedicine.org/non-surgical-options/spinal-injections/ (last visited July 13, 2015).

After an initial denial from her insurance company, Plaintiff was authorized for an SCS trial. (Tr. 409.) In December 2010, Plaintiff underwent implantation of two Medtronic thoracolumbar epidural spinal cord stimulation leads for a trial of SCS. (*Id.* at 412.) Following that procedure, Plaintiff reported that her pain was at least 50% improved. (*Id.* at 415, 417.) Her mobility, gait, muscle tone, and pain behaviors were reported as normal. (*Id.*) Initially, Plaintiff reported "that she was happy with her current course program and stimulation." (*Id.* at 420.) A few days later, however, Plaintiff complained that she had not received stimulation to her most painful areas. (*Id.* at 421.) Plaintiff met with Medtronic personnel to reprogram the stimulator but later reported that her pain was only reduced by ten percent. (*Id.* at 422.) A SCS retrial was discussed and sought through her insurance company. (*Id.* at 422, 426.)

Plaintiff continued to report pain in January 2011. (Tr. 424.) She rated her pain as more intense — "10 out of 10." (*Id.*) In February, her pain rating was down to "7 out of 10." (*Id.* at 428–29.) Plaintiff's COBRA insurance expired, making her ineligible for an SCS retrial. (*Id.* at 429.) She became a "self-pay client." (*Id.*) Cymbalta was tapered off for financial reasons. (*Id.* at 430.) In March 2010, Plaintiff noted that her pain was still "7 out of 10" and remained stable after tapering off Cymbalta and increasing her dosage of Nortriptyline. (*Id.* at 434–36.) A request to substitute her Percocet for Vicodin was accommodated. (*Id.* at 436.) Plaintiff was described as "functioning well on the current medication regimen." (*Id.*) Sometime later, Plaintiff obtained coverage through Medicaid. (*Id.* at 541.)

In December 2011, Plaintiff's gait, motor strength, speed, dexterity, bulk, and tone in her upper and lower extremities were all normal. (Tr. 446.) Plaintiff had an MRI conducted on both her lumbar spine and cervical spine. (*Id.* at 463, 465.) The lumbar spine MRI revealed "mild circumferential marginal spurring and disc bulging" at the L2-3 and L4-5 levels and a laminectomy defect present at the L2-3 and L3-4 levels. (*Id.* at 463.) Additionally, the MRI showed "signal changes" at the L2-3 and L4-5 levels related to degenerative disc disease. (*Id.* at 464.) The cervical spine MRI revealed minimal "bulging and spurring" at the C4-5 level along with some additional degenerative changes. (*Id.* at 465.)

In January 2012, Plaintiff described having difficulty standing up straight and continued to suffer from pain in her legs, lower back, and neck. (Tr. 535.) A physical examination demonstrated an antalgic gait (i.e., a gait to avoid pain), but she had normal strength, speed, dexterity, bulk, and tone in her upper and lower extremities bilaterally. (*Id.* at 440.) Further, a neurological examination revealed that she had normal proprioception and light touch in both upper and lower extremities. (*Id.*) Her deep tendon reflexes were normal and symmetric in both upper and lower extremities. (*Id.*)

Plaintiff's physical and neurological examinations showed similar results in May 2012; however, she reported that the pain in her back was interfering with her sleep. (*See* Tr. 534, 571.) Physical and neurological examinations conducted in July 2012 were normal. (*Id.* at 567.) Plaintiff fell out of bed the morning of June 10, 2012, landing on her right shoulder and hip. (*Id*. at 533.) Later that month she reported pain in her back, legs, and neck and she was taking more Percocet than she should. (*Id*. at 535.)

In October 2012, Plaintiff requested medication to cover a trip to Okinawa, Japan from November 7, 2012, to December 18, 2012. (Tr. 531.) The purpose of her trip overseas was to help take care of a friend's newborn baby. (*Id.*) Another medical note indicates that Plaintiff would return to the United States "for 6 weeks prior to returning to Japan again." (*Id.* at 690.) She flew back when her father became ill. (*Id.* at 767.) She told her physician that she planned to return to Okinawa on January 16, 2013. (*Id.*)

In January 2013, Plaintiff's physical examination demonstrated that she had normal motor strength and tone in her upper and lower extremities. (Tr. 796.) A medical note indicates a "highly disorganized opiate pain relief regimen"; however, no changes were made because Plaintiff was "leaving for Japan for 1-2 months." (*Id.* at 765.) Her gait, muscle strength, and tone were normal during a physical examination in March 2013. (*Id.* at 771.) In April 2013, Plaintiff remarked that the increase to her Fentanyl dosage was a "good fit" and that she was taking one to two Percocet every day for "breakthrough pain." (*Id.* at 760.) Her less complicated regimen provided better overall pain control. (*Id.*)

In May 2013, Plaintiff reported that she needed breakthrough pain medication more frequently. (Tr. 758.) She felt that her pain control was "subpar." (*Id.*) She noted, however, that a change to Duragesic gave her better ongoing pain control. (*Id.*) Her Fentanyl dosage was again increased. (*Id.* at 775.)

In June 2013, Plaintiff was seen for cervicalgia.[4] (Tr. 755.) Plaintiff reported her pain at "10 out of 10." (*Id.* at 818.) She had antalgic gait but normal strength, speed, dexterity, bulk, and tone in both upper and lower extremities. (*Id.* at 806.) Neurologically, Plaintiff had normal proprioception and light touch in both upper and lower extremities, as well as normal deep tendon reflexes that were symmetric in both upper and lower extremities. (*Id.* at 807.) Eric Harl, a physician's assistant, noted Plaintiff's severe neck and lower back pain. (*Id.* at 781.)

In October 2013, Plaintiff reported suffering from neck, right shoulder, and right scapular pain. (Tr. 961.) She described the pain as worse on her right side than her left. (*Id.*) Her right arm felt weak. (*Id.*) Her persistent and chronic lower back pain was noted as being managed by using Fentanyl patches every three days. (*Id.*) An MRI revealed cervical degenerative changes and some right C6 neural impingement. (*Id.* at 963.) A steroid injection was recommended. (*Id.*)

### ii.    Gastric Bypass and Hyperthyroidism

Plaintiff had gastric bypass surgery in 2007. (Tr. 876.) The surgery helped her drastically reduce weight, from 340 to 175 pounds. (*Id.*) Medical records dated September 24, 2013, show that she has since regained 40 pounds. (*Id.*)

---

[4]    "Cervicalgia is neck pain that occurs toward the rear or the side of the cervical vertebrae. It generally is felt as discomfort or a sharp pain in the neck, upper back or shoulders. The term cervicalgia covers a broad range of neck pain causes, including whiplash, muscle strain, ligament sprain, and inflammation of the neck joints. It also can be caused by a number of abnormalities in the region of the cervical vertebrae, including a bulging disc, a pinched nerve, . . . spinal arthritis or degenerative disc disease." Michael Perry, *Cervicalgia*, Laser Spine Institute, https://www.laserspineinstitute.com/ back_problems/neck_pain/overview/cervicalgia/ (last visited June 26, 2015).

Plaintiff was noted to have a medical history of hyperthyroidism. (*Id.* at 440.)

### iii.    Carpal Tunnel Syndrome

In October 2007, Plaintiff reported numbness and tingling primarily in digits one through three of her right hand. (Tr. 454.) Her response to pinpricks on digits one and two of her right hand were decreased. (*Id.*) An EMG examination was performed, showing evidence of moderate right carpal tunnel syndrome. (*Id.* at 450.) Dr. Vanda Niemi diagnosed Plaintiff with carpel tunnel syndrome and Raynaud's disease.[5] (*Id.*) A wrist splint was recommended with follow-up in approximately 8 weeks. (*Id.*)

In December 2011, Plaintiff noted clumsiness in her right hand. (Tr. 445.) Plaintiff demonstrated a positive "Phalen's sign" in her right and left hands, an indication of carpal tunnel syndrome. (*Id.* at 446.) Plaintiff also reported waking up at night to burning and tingling in both hands. (*Id.* at 587.)

Plaintiff had carpal tunnel release surgery on her right hand in January 2012. (Tr. 659.) She reported that the surgery improved her symptoms overall and that her hand was not as numb. (*Id.* at 439.) Plaintiff had normal sensations over her hands to light touch. (*Id.* at 440.) In April 2012, Plaintiff had carpal tunnel release surgery on her left

---

[5]    Raynaud's disease causes parts of the body, like fingers and toes, to feel numb and cold in response to cold temperatures or stress. The smaller arteries that supply blood to the skin narrow, thereby limiting blood circulation to those areas. Women are more likely to be affected than men, as are individuals who live in colder climates. "For most people, Raynaud's disease isn't disabling, but [it] can affect quality of life." *Raynaud's Disease Definition*, Mayo Clinic (Mar. 4, 2015), http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916.

hand. (*Id.* at 663.) Plaintiff reported that she was happy with the outcome of her surgeries and that her fingers no longer tingled. (*Id.* at 566, 674, 805.)

In June 2013, an EMG was performed to evaluate the status of Plaintiff's carpel tunnel syndrome. The EMG showed evidence of moderate, right median neuropathy across the wrist, as well as focal demyelination with no loss of axons. (Tr. 809–17.) In September 2013, Plaintiff reported intermittent numbness in her right hand and that she was wearing wrist splints nightly. (*Id.* at 866.) In October 2013, Mr. Kearin, a physician's assistant, noted decreased sensation to light touch in Plaintiff's right little finger. (*Id.* at 962.)

### iv.    Ankle Surgery

Plaintiff began to complain of leg fatigue and ankle pain in August 2010. (Tr. 343.) She presented for evaluation due to persistent pain in her right ankle in November 2012. (*Id.* at 740.) Her ankle range of motion was within normal limits, though some pain and limited mobility were noted in the right ankle. (*Id*. at 742.) Dr. Kevin Lind recommended surgery to remove "the large and painful os trigonum, as well as an ankle scope to remove the loose bodies in the anterior ankle, clean up the synovitis and address the small osteochondral talar dome lesion." (*Id.* at 690.) Plaintiff underwent ankle surgery in December 2012. (*Id.* at 736.) Plaintiff tolerated the surgery well. (*Id.* at 737.) She was ordered a "Roll-A-Bout" for non-weight-bearing right ankle. (*Id.* at 746–47.) A post-operative examination suggested that her ankle range of motion was "very good" and that she could "ambulate as tolerated." (*Id.* at 750.) She was not placed on any work or school limitations and was instructed to ambulate as tolerated. (*Id.* at 750.)

In April 2013, however, Plaintiff reported continuing ankle pain, some calf pain, and numbness in some of her toes. (Tr. 785.) She was directed to physical therapy and instructed to use the Roll-A-Bout due to the leg/calf pain. (*Id.* at 786.)

### v.     Restless Limb Syndrome

Plaintiff began experiencing numbness in her legs in October 2010. (Tr. 399.) She was diagnosed with restless limb syndrome with periodic limb movements during sleep. (*Id.* at 440.) Plaintiff initially tried Risperdol for her restless limb syndrome but found that it caused her symptoms to worsen. (*Id.* at 693.) In January 2013, Plaintiff noted that Pramipexole was working well for her restless legs and that the twitching was controlled, but she was still suffering from occasional bouts. (*Id.* at 796–97.) Overall, Plaintiff felt that the Pramipexole was controlling her restless legs well. (*Id.*)

In June 2013, Plaintiff reported periodic limb movements throughout the day despite using Pramipexole. (Tr. 806.) She was given Neupro patch samples to help control her restless legs. (*Id.* at 807.) Notably, Plaintiff suffered from an iron deficiency, which potentially impacted her restless limb syndrome. (*Id.* at 807, 952.) In September 2013, Plaintiff reported that Neupro patches were controlling her restless legs. (*Id.* at 863.) Plaintiff indicated that she no longer had to "stomp her feet" and that the patches were the most effective at controlling her symptoms. (*Id.*)

### vi.     Daytime Sleepiness and Obstructive Sleep Apnea

Plaintiff reported having difficulty sleeping as early as October 2007. (Tr. 454.) She again reported trouble sleeping in June 2010. (*Id.* at 317.) Her sleep difficulties are occasionally attributed to pain. (*Id.* at 334, 368, 402.) She reported occasionally being

woken up from severe tingling in her hands. (*Id.* at 445.) She denied, however, being kept awake due to her medication regimen. (*Id.* at 317, 368.) Dr. Hernandez observed in December 2011 that Plaintiff's caffeine intake of "a number of 24-ounce cans of caffeinated Mountain Dew" may be affecting her sleep. (*Id.* at 446-47.)

In December 2011, Plaintiff underwent a sleep study that showed that she suffered from mild sleep obstructive apnea. (Tr. 485–90.) A CPAP machine set at 6 cm normalized her breathing and provided the best resolution to her sleep apnea. (*Id.*) But in January 2012, Plaintiff reported that she still was not sleeping well and was only able to sleep for four-and-a-half hours per night at best. (*Id.* at 535.) Plaintiff was placed on medication to help her sleep, which she said was helpful. (*Id.* at 439.)

Plaintiff's sleep difficulties continued into June 2013. (Tr. 779.) Further, she reported being tired during the day. (*Id.* at 806.) Mr. Harl, PA, noted that Plaintiff was under a number of medications which could potentially cause over-sedation. (*Id.* at 755.) Her medications were altered in response to her complaints of daytime fatigue. (*Id.* at 807–08.) Her provider also suggested a twenty to thirty minute power nap if she became tired during the day. (*Id.* at 568.)

Plaintiff underwent another sleep study to better configure her CPAP machine. (Tr. 864.) Based upon the study, she was switched from a CPAP to a BiPAP configuration, which made her feel more awake. (*Id.*) The benefits of the BiPAP, however, lasted only one week, and she was back down to sleeping six hours a night. (*Id.*) Plaintiff noted that she was still drowsy during the day but was otherwise able to

remain awake. (*Id.*) Unfortunately, in July 2012, Plaintiff reported having a car accident after falling asleep while driving. (*Id.* at 838.)

In September 2013, Plaintiff was provided medication to help her stay awake with a warning that it would not remove the sedating effects of her other medications. (Tr. 866.) The following month, Mr. Donald Resemius, a Licensed Associate Marriage and Family Therapist ("LAMFT"), noted that Plaintiff had difficulty keeping her eyes open at times. (*Id.* at 971.)

### vii. Mental Health

Plaintiff's mental health issues appear in her medical records beginning in June 2010. In June 2010, Plaintiff was described as awake, alert, and oriented. (Tr. 318.) At that time, she denied suffering from depression or suicidal ideation. (*Id.*) Her mood and affect were normal and she was oriented to person, time, and place. (*Id.*) In July 2010, she denied any symptoms of anxiety disorder and any history of mental health issues or mental healthcare, though she noted that her living situation at home was extremely stressful. (*Id.* at 340–41.) Her mood was euthymic[6] and her affect appeared to be within normal limits. (*Id.*)

But Plaintiff disclosed increased life stressors relating to a family member's mental illness. (Tr. 392.) An examination conducted in October 2010 showed that she

---

[6]     Euthymic is a medical term, derived from the term "euthymia," which refers to a moderated or tranquil mood, neither manic nor depressed. *See Sultan v. Barnhart*, 368 F.3d 857, 861 n.2 (8th Cir. 2004); *Daniels v. Astrue*, Civ. No. 12-407 PAM/AJB, 2013 WL 1339350, at *2 (D. Minn. Feb. 6, 2013).

was awake, alert, and oriented to person, time, and place. (*Id.* at 404.) Her mood and affect were normal. (*Id.*)

A twelve-system review of Plaintiff in December 2011 was positive for difficulties with dizziness, weakness/tingling, various pains, depression, and difficulty sleeping. (Tr. 445.) Her depression worsened over the next few months. (*Id.* at 535.) Plaintiff cried throughout an examination in January 2012, but she denied suicidal intent. (*Id.* at 536.) A review of her systems showed positive signs for both depression and anxiety. (*Id.* at 439.)

In March 2012, Plaintiff noted that she felt depressed all the time. (Tr. 711.) She suffered from decreased appetite, low energy, and feelings of helplessness, hopelessness, and worthlessness. (*Id.*) She denied feeling suicidal. (*Id.*) Dr. Joseph Richmond, a psychiatrist, noted that her depressive symptoms were secondary to her pain and suggested that she consider individual psychotherapy. (*Id.* at 712.)

In April 2012, Plaintiff had some improvement in her mood. (Tr. 696.) Additionally, in May 2012, she noted that her mood was stabilized on Geodon and she denied any depressive symptoms beyond some symptoms secondary to her pain. (*Id.* at 699.) Plaintiff was "caring for a baby, who was giving her significant joy and helping with her depressive [symptoms]." (*Id.*) Her mood was euthymic and she denied any suicidal ideation. (*Id.* at 701.) Her improved mood continued into June 2012, when she noted that she was less depressed on her medication regimen. (*Id.* at 702.) Her mood remained euthymic. (*Id*.) She kept busy taking care of the baby, stating, "[t]he baby is helping pull me out of my hole." (*Id.*)

Plaintiff's mood, however, had worsened by September 2012 when she reported being frustrated with life. (Tr. 705.) Yet, she denied thoughts of harming herself or feeling suicidal, her mood was still euthymic, and her thought process was goal-directed. (*Id.* at 705, 707.)

Plaintiff's mood improved by November 2012, as she made plans to travel to Japan for a month and a half to care for her friend's newborn. (Tr. 708.) She was still feeling tired. (*Id.*) A mental status examination noted that her mood was euthymic, her affect appropriate, and her thought process goal-directed. (*Id.* at 710.) She returned from Japan in December 2012 due to her father's illness. (*Id.* at 725, 767.)

In January 2013, she noted that she was stable on her current medications and that she intended to return to Japan at the end of the month. (Tr. 725.) A mental examination revealed that she was euthymic, her thought process was goal-directed, and her insight and judgment were intact. (*Id.* at 727.) Further, she was noted to be alert, attentive, oriented, and cooperative. (*Id.* at 796.) Her mood and affect appeared stable. (*Id.*)

In March 2013, Plaintiff was reportedly depressed. (Tr. 770.) Her father died the prior December and her uncle passed away the prior February. (*Id.*) She suffered from heightened anxiety but was not suicidal. (*Id.*) Further, by April 2013, she planned to move in with her mother to help with her care. (*Id.* at 772.) Plaintiff noted that she had "good days and bad days." (*Id.* at 773.) On some days she wore makeup and took better care of herself. (*Id.*) She noted that her Fentanyl medication was helping her significantly with being able to function. (*Id.*) In March, April, May, and June of 2013, Plaintiff's examinations demonstrated that she had a depressed mood, logical thought content, goal-

directed thought processes, no suicidal ideation, intact memory, and focused attention span. (*Id.* at 771, 773, 775, 780.)

Plaintiff reported attending a number of funerals for her friends and family in June 2013. (Tr. 777.) She reported feeling depressed, having less energy, and having a low appetite. (*Id*. at 779, 818.) Plaintiff noted that she regularly just sat and cried, though she denied feeling suicidal. (*Id.* at 777.) She also reported that she continued to wear makeup and dressed well to make herself feel better. (*Id.* at 779.) Plaintiff denied feeling helpless, hopeless, or worthless. (*Id.*)

Plaintiff appeared significantly improved and well in early July 2013. (Tr. 827.) She was noted to have a more normal mood, affect, eye contact, grooming, and orientation. (*Id.*) By mid-July, however, Plaintiff reported feeling depressed again. (*Id*. at 830.) She reported low energy levels; being anxious and restless; and feeling hopeless, helpless, and worthless. (*Id*.) She had suicidal ideation but did not have any intent or plan. (*Id*.) She expressed a desire to go to the hospital after her sleep study for better mood stabilization. (*Id.*) In mid-July, Plaintiff was noted to have high depressive symptoms, but she denied suicidal ideation. (*Id*. at 839.) She was taken by a friend to the Cambridge Medical Center Emergency Room on July 23, 2013, due to concerns of depression and suicidal thoughts. (*Id*. at 893.) Plaintiff said she wished she had died in her recent car accident. (*Id*.) At discharge from inpatient treatment, Plaintiff was described as more stable, less depressed, more alert, and more hopeful for the future. (*Id*. at 894.) She denied suicidal ideation. (*Id*.) Her mental health examination revealed that

her mood was sad, that she had anxiety, and that she was worried, but also that she was more animated and demonstrated good insight and judgment. (*Id*. at 895.)

Plaintiff reported continued depression in August 2013, though she also noted feeling well and having more energy due to a change in medication. (Tr. 820, 842.) Overall, though, Plaintiff felt things were still not going well; she was still feeling down and depressed and was still having bad days. (*Id*. at 844.)

Plaintiff was driven to an emergency room by her sister on September 3, 2013. (Tr. 921.) She was reportedly having thoughts about suicide, including overdosing on her medication. (*Id*.) At discharge, Plaintiff was noted to be oriented to person, place, and time and in a good mood; she demonstrated normal attention and concentration along with organized and goal-directed thought processes. (*Id*. at 923–24.) Plaintiff's medications were noted to be a potential source for her energy and mood problems. (*Id*. at 922.) Plaintiff reported to her therapy session with further depressive symptoms. (*Id*. at 848–49.) Her family and finances were also causing her anxiety. (*Id*. at 851.)

In October 2013, Plaintiff complained of being very depressed and noted that she had not left her house for a week. (Tr. 854.) Her mental examination demonstrated logical-thought content; goal-directed thought processes; intact insight, judgment, and memory; and focused attention and concentration. (*Id*. at 956.) On October 18, 2013, Dr. Joseph Richmond wrote a letter stating that he did not foresee any significant improvement in Plaintiff's overall mental health status such that she could sustain work. (*Id*. at 959.) Plaintiff's Psychotherapist, Mr. Donald Resemius, wrote a letter supporting Plaintiff's application for disability benefits, stating that it would be unlikely that she

would be able to manage in a competitive work environment and maintain employment. (*Id.* at 972.)

### B. Hearing Testimony

#### i. Plaintiff's Testimony

An administrative hearing was held on October 29, 2013. At the hearing, Plaintiff testified that she is educated through a partial year of college. (Tr. 37.) She stated that she previously worked in corporate management and that her last full-time position was as a team lead at American Express. (*Id.* at 48.) She was laid off from that position. (*Id.*) Plaintiff noted that she knows how to use a computer. (*Id.* at 37.) Further, she noted that she is able to drive a car for forty-five minutes or less without needing medication to help keep her awake. (*Id.* at 36.)

Plaintiff explained that she is capable of walking a couple of blocks before having to stop due to her neck and back pain. (Tr. 38.) She further testified that she does not need a cane or assistance for walking, but when she grocery shops she requires an electric cart as her neck and back pain stops her from being able to freely walk about the store. (*Id.*) Plaintiff stated that she is able to bathe, dress, and feed herself; conduct basic hygiene activities; and otherwise care for herself. (*Id.* at 39.) She does not, however, otherwise perform household chores. (*Id.*) Additionally, Plaintiff noted that she is only able to prepare frozen meals. (*Id.* at 50.)

Plaintiff testified that her neck and shoulder pain occurs "every moment of every minute of every day." (Tr. 40.) Her pain, she explained, is constant in duration but varies in intensity. (*Id.*) Plaintiff described the pain as a "hot poker" going through her neck and

shoulder. (*Id.* at 41.) The pain occurs primarily on the right side but has been radiating

toward the left side as well. (*Id.*) She is taking Percocet, Fentanyl, and Gabapentin for her

degenerative disc disease. (*Id.* at 40.)

Plaintiff testified that the medications for her depression are only occasionally

helpful. (Tr. 43.) She noted that there are days in which she cannot get out of bed. (*Id.*)

Sometimes she will remain in bed for two to four days at a time. (*Id.* at 50.) She

explained that she had previously been hospitalized for psychiatric reasons. (*Id.* at 43.) In

response to her counsel's questions, Plaintiff explained that she may or may not shower

depending on her mental state and whether she has somewhere to go. (*Id.* at 50.) Further,

Plaintiff noted that she has trouble meeting people and making friends due to her medical

problems. (*Id.* at 51.)

Plaintiff testified that she still has problems after her microdiscectomy. (Tr. 49.)

Further, she explained that although she had bilateral carpal tunnel release surgery, she

still has problems with the last three fingers on her right hand being numb all the time.

(*Id.* at 38–39.) Additionally, she reported suffering from numbness in her right ankle as a

result of her ankle surgery. (*Id.* at 39.) She noted that she uses a BiPAP machine to help

her sleep, which is only occasionally effective, and that she suffers from over-sedation

from medications. (*Id.* at 45, 47.)

Plaintiff testified that it typically takes her twenty to thirty minutes to get out of

bed each day due to her back pain. (Tr. 50.) If she stays in, Plaintiff explained, she will

try and watch television but is unable to concentrate on television shows for more than an

hour. (*Id.*) Plaintiff discussed her travel to Japan to help her friend care for a baby. (*Id.* at 45.)

Plaintiff testified that she was unable to do a light-duty job or sedentary work due to her restless limbs. (Tr. 52.) She explained that she needs to stomp her legs to get her restless leg syndrome to stop. (*Id.*) Sometimes she requires only ten minutes before she can resume sitting at a desk, but other times it may require thirty minutes or more. (*Id.*) Finally, Plaintiff noted that she feels that she would definitely miss more than two days of work each month. (*Id.*)

### ii.    Vocational Expert's Testimony

Robert Brezinski testified at the administrative hearing as a vocational expert. (Tr. 56.) The ALJ posed a hypothetical question to Brezinski about a person of approximately Plaintiff's age, education, and past work experience who also had the following limitations: sedentary type of job with no more than occasional power gripping; no overhead tasks; no more than occasional bending, twisting, stooping, kneeling, crouching, or crawling; no exposure to hazards such as heights or dangerous unprotected machinery; limited to essentially routine, repetitive, two- to three-step tasks and instructions; no more than superficial contacts with others in the work setting; and no more than routine stressors in a repetitive type of job. (*Id.* at 57–58.) Brezinski testified that such a person would not be able to do Plaintiff's relevant past work. (*Id.* at 58.)

Brezinski also testified that such limitations would limit a person to unskilled work and that Plaintiff's relevant past work contained no relevant transferable skills. (Tr. 58.) Brezinski further testified that a person bound by those limitations would be able

to work as a final assembler in the optical goods area, a printed circuit board assembler/final touch-up screener, and an automatic bonding machine tender. (*Id.*) In response to a question from Plaintiff's counsel, Brezinski testified that a person who needed an unscheduled break every hour would be tolerated if it was confined to getting water or stretching for a couple of minutes. (*Id.* at 59.) Finally, Brezinski testified, again in response to counsel's question, that no jobs would tolerate an employee having to miss work more than two days each month. (*Id.*)

### iii.   Medical Expert's Testimony

Dr. Andrew Murphy Steiner testified as a medical expert during the hearing. (Tr. 53.) He testified that Plaintiff was diagnosed with chronic pain syndrome, obesity with a history of a bypass procedure in 2007, hyperthyroidism, obstructive sleep apnea progressing from mild to severe, and restless leg syndrome. (*Id.* at 53–54.) He noted treatments for low back pain, a laminectomy at L4-L5 in 2005, and a microdiscectomy at L2-L3 in 2010. (*Id.* at 54.) He further noted that her EMG was normal for radiculopathy findings and that there was no evidence of lingering radicular neurological loss. (*Id.*) He continued to note treatment and two surgeries for carpal tunnel, one on each side. (*Id.*) However, he noted some lingering pain in the right wrist with a recent nerve conduction study demonstrating lingering changes on the right side. (*Id.*)

Dr. Steiner stated that there was evidence of degenerative disc disease with upper extremity radiation, which had been more pronounced in the recent months. (Tr. 54–55.) He explained, however, that the EMG did not demonstrate a radicular component and that, clinically, Plaintiff was neurologically intact. (*Id.* at 55.) He noted past epidural

24

steroid injections, a history of right ankle surgery, and consistent reports of daytime sleepiness related in part to Plaintiff's medications. (*Id.*) Addressing whether Plaintiff would meet a Social Security medical listing, Dr. Steiner underscored that Plaintiff's lumbar surgeries were at least technically successful and that there was no neurological compromise with the degenerative changes seen in her neck. (*Id.*) Dr. Steiner did not believe that she would meet a Social Security medical listing. (*Id.*) Finally, Dr. Steiner testified that as far as work limitations were concerned, the record described someone "more at the sedentary level as far as lifting and time on feet." (*Id.*) He explained that there would be an inability to do anything more than occasional power gripping; no overhead work; and a limitation to occasional bending, twisting, stooping, kneeling, crawling, and crouching. (*Id.*) He also noted that hazardous machinery would be out. (*Id.*) Finally, in response to Plaintiff's counsel's question, Dr. Steiner confirmed that he was not providing testimony regarding whether Plaintiff met a listing for any psychological impairments. (*Id.* at 56.)

### C. ALJ's Findings and Decision

On December 9, 2013, the ALJ denied Plaintiff's applications for disability benefits and supplemental security income. (Tr. 22.) The ALJ determined that Plaintiff was not under a disability, as defined by the Social Security Act, from May 31, 2009, through the date of decision. (*Id.*) To arrive at that decision, the ALJ followed the five-step procedure for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520(a).

At step one, the ALJ determined that Plaintiff had not engaged in any gainful activity since the alleged disability onset date of May 31, 2009. (Tr. 11.) At step two, the ALJ found that the Plaintiff had "the following severe impairments: chronic pain; obesity refractory to treatment with gastric bypass in 2007; hyperthyroidism; obstructive sleep apnea; restless leg syndrome; low back pain; history of laminectomy at the L4-L5 level in 2005; history of micro-discectomy at the L2-L3 level in 2010; lumbar degenerative disc disease; carpal tunnel syndrome with a history of bilateral carpal tunnel release in 2012; neck pain and upper extremity radiation associated with degenerative cervical disc disease; history of right ankle surgery in December 2012; daytime sleepiness; major depressive disorder, recurrent, moderate severity; anxiety disorder; and episodic mood disorders." (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments listed in 20 C.F.R., Part 404, Subpart P, App. 1. (*Id.* at 12.)

Before proceeding to steps four and five, the ALJ determined that Plaintiff did not meet the criteria necessary to show a mental impairment-related functional limitation that would be incompatible with the ability to do any gainful activity. (Tr. 13.) The ALJ determined that Plaintiff suffered only mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (*Id.* at 14.) The ALJ determined that these findings were consistent with the Plaintiff's daily living activities as well as medical opinions in the record and the evidence taken as a whole. (*Id.*)

In evaluating Plaintiff's symptoms and their consistency, the ALJ determined that her medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 16.) But the ALJ found Plaintiff's representations concerning the intensity, persistence, and functionally-limiting effects of the symptoms generally not credible. (*Id.*) The ALJ found those representations particularly inconsistent with the physical examinations in the record. (*See id.* at 16–17.) Additionally, the ALJ accorded little weight to the opinion of Eric Hale and afforded great weight to the government's non-examining physician, Dr. Steiner. (*Id.*) The ALJ also accorded significant weight to the government's non-examining psychological consultants as compared to minimal weight to the letters prepared by Dr. Richmond and Mr. Resemius, given their inconsistency with the record as a whole. (*Id.* at 19.)

The ALJ concluded that Plaintiff had the residual functioning capability ("RFC") to perform sedentary work as defined by 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Tr. 15.) Further, the ALJ found additional limitations of no more than occasional power gripping; no overhead tasks; no more than occasional bending, twisting, stooping, kneeling, crouching, or crawling; no exposure to hazards such as unprotected heights or dangerous machinery; no more than routine, repetitive, three to four-step tasks and instructions; no more than superficial contact with others; and no more than routine stressors associated with a routine and repetitive kind of job. (*Id.*)

At step four of the disability determination, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. 20.) But, at step five of the disability determination, the ALJ credited the opinion of the vocational expert that Plaintiff could

work as a final assembler in the optical goods area, a printed circuit board assembler/final touchup screener, or as an automatic bonding machine tender. (*Id.* at 21–22.) Because Plaintiff was able to perform other work existing in significant numbers in the national economy, the ALJ found that she was not disabled within the meaning of the Social Security Act. (*Id.* at 22.) Accordingly, the ALJ denied her applications for disability benefits and supplemental security income. (*Id.* at 9.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

This Court has the authority to review the ALJ's final decision denying disability benefits. *See* 42 U.S.C. § 405(g); *Kluesner v. Astrue,* 607 F.3d 533, 536 (8th Cir. 2010). "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v.*

*Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). The Court "must consider evidence that both supports and detracts from the ALJ's decision, but . . . will not reverse an administrative decision simply because some evidence may support the opposite conclusion." *Id.*(internal quotation marks omitted).

Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would accept it as sufficient to support the decision. *McDade v. Astrue,* 720 F.3d 994, 998 (8th Cir. 2013). The Court will not reverse the ALJ's decision simply because the record supports a contrary conclusion. *Id.* If it is possible to draw two inconsistent conclusions from the evidence, one of which supports the ALJ's findings, the Court must affirm the ALJ's decision. *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014). The Court may not substitute its own opinion for that of the ALJ, even if the Court would have reached a different conclusion in the first instance. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). "Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record *de novo*." *Flaherty v. Halter*, 182 F. Supp. 2d 824, 843 (D. Minn. 2001).

The plaintiff bears the burden of proving disability. 20 C.F.R. § 404.1512(a); *Whitman,* 762 F.3d at 705. If the plaintiff meets this burden and establishes an inability to do past relevant work, the burden then shifts to the Commissioner to prove "that the Plaintiff retains the RFC to do other kinds of work, and second, that other work exists in substantial numbers in the national economy that the Claimant is able to perform." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

## II.  Analysis of ALJ's Decision

Plaintiff alleges four errors by the ALJ. (Doc. No. 21, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 29.) She first argues that the ALJ improperly discounted her statements regarding her impairments and functioning ability. (*Id.* at 30–40.) Second, she argues that the ALJ erred in the amount of weight he gave to the various medical opinions in the record. (*Id.* at 40–44.) Third, she argues that the ALJ failed to include all of her impairments in the hypothetical posed to the vocational expert. (*Id.* at 44–45.) Finally, Plaintiff argues that the case should be remanded to the ALJ to consider medical records detailing her two visits to a mental health unit. (*Id.* 45–46.)

### A.  Credibility

#### i.  *Polaski* Factors

An ALJ is required to consider the following factors when assessing a claimant's subjective complaints of pain: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. *McDade*, 720 F.3d at 998; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ must acknowledge and examine these factors before discounting a claimant's subjective complaints of pain, he need not methodically examine each one. *McDade*, 720 F.3d at 998. Where the ALJ gives good reasons for discounting a claimant's credibility, this Court will defer to the ALJ's judgment, even where every factor is not discussed in depth. *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).

This Court finds that the ALJ properly discounted Plaintiff's credibility based on the evidence in the record. The ALJ examined the record and cited to the specific elements that impacted his determination. The reasons provided by the ALJ for his determination are consistent with those required under the *Polaski* factors. The ALJ cited statements by medical providers regarding the outcome of Plaintiff's treatments, inconsistencies in the Plaintiff's statements to medical providers, and the effectiveness of Plaintiff's medication.

First, the ALJ noted that many of Plaintiff's treatments for her underlying medical problems were technically successful. A post-operative examination by physician John C. Mullan revealed that "lower extremity strength is noted to be normal[,] . . . [and] [s]ensation is fully intact[,]" and that "[g]ait and balance were smooth and steady." (Tr. 303.) The treating physician noted that Plaintiff was able to lift thirty to thirty-five pounds and that she "can return to activity without restrictions if she continues to feel well." (*Id.*) A later neurological examination performed by Dr. Brian Vacca on June 30, 2010, demonstrated that Plaintiff's lower extremities were operating normally and that her gait was normal. (*Id.* at 319.) There was some noted hyperactivity in the right patellar and Achilles reflexes, but overall her upper and lower extremities were within normal limits. (*Id.*)

Plaintiff had numerous medical examinations in 2011 and 2012 in which her musculoskeletal and neurological systems were found to be functioning normally. (*See, e.g.*, Tr. 567, 571, 575, 582.) Though an examination in 2013 indicated that "[t]he patient is not doing well[,]" doctors continued to note that her musculoskeletal motor functions

were normal for "strength, speed, dexterity, bulk and tone in both upper and lower extremities bilaterally" and that her neurological sensory systems had "normal proprioception and light touch in both upper and lower extremities bilaterally." (*Id.* at 806–07.) A medical examination in September 2013 came to a similar conclusion regarding her musculoskeletal and neurological systems. (*Id.* at 865.) Furthermore, in 2013 after recovering from ankle surgery, Plaintiff was instructed to "ambulate as tolerated." (*Id.* at 750.)

These examinations are notable in that they demonstrate both that Plaintiff's musculoskeletal and neurological systems were functioning normally and that there were no functional restrictions placed on Plaintiff during the relevant time period. "A lack of functional restrictions is inconsistent with a disability claim." *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003); *see also Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (noting a lack of functional restrictions combined with recommendations to increase physical exercise is inconsistent with a claim of disability).

Second, the ALJ relied on portions of the record that demonstrated that Plaintiff's medications were effective in treating her pain. Specifically, the ALJ pointed out that Plaintiff had been "weaned off all pain medication" on December 17, 2009 (Tr. 303); that she reported on April 9, 2013, that the Fentanyl/Duragesic patches combined with Percocet for "breakthrough pain" were "a good fit" (*id.* at 760); and that she indicated on October 21, 2013, that her lower back pain had been managed by regular Fentanyl patches combined with Percocet (*id.* at 961). Evidence that effective medication mitigates pain and provides relief is relevant to an ALJ's credibility determination. *Guilliams v.*

*Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)); *see also Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (stating that use of TENS unit, physical therapy, and medication to control pain were factors that contributed to ALJ's credibility determination).

Third, the ALJ accurately noted where the Plaintiff's statements were inconsistent with her claims of disabling pain. In 2009, Plaintiff noted that her right lower extremity pain "had almost . . . fully resolved and seem[ed] to be improving on a weekly basis" (Tr. 303); that Pramiprexole was controlling her restless legs (*id.* at 797); that she was happy with the outcome of her carpal tunnel surgery (*id.* at 863); and that her neck pain was not a disabling problem before a sudden onset a few weeks prior to October 2013 (*id.* at 961). Finally, she was excited to be traveling to Japan to stay with some friends and that she was looking forward to the trip. (*Id.* at 797.)

In sum, the ALJ discussed evidence in the record relevant to the *Polaski* factors in making his determination regarding Plaintiff's subjective complaints of pain. Because the ALJ gave sufficient reasons for discounting those complaints, this Court must defer to the ALJ's credibility determination.[7] *See Renstrom*, 680 F.3d at 1067.

---

[7]     While the ALJ did not discuss Plaintiff's daily activities in his examination of the *Polaski* factors, he did discuss them immediately prior in his opinion. A detailed examination of Plaintiff's daily activities supports the ALJ's credibility determination. Plaintiff was able to care for a pet (Tr. 233, 258), prepare simple meals throughout the day (*id.* at 235, 259), perform some household chores (*id.* at 234), drive her car (*id.* at

(Footnote Continued on Next Page)

### ii. Raynaud's Disease

Plaintiff also contends that the RFC determination made by the ALJ was insufficient because the ALJ did not take into account her Raynaud's disease. A plaintiff's RFC represents the maximum capability under which she can function considering her limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed through all relevant evidence in the record including medical records, observations of treating physicians, and a plaintiff's own statements. *Guilliams*, 393 F.3d at 801.

Here, substantial evidence supports the ALJ's RFC determination. The ALJ found credible medical examinations from January 31, 2012, which noted that Plaintiff had "normal proprioception and light touch in both upper and lower extremities bilaterally." (Tr. 17.) The ALJ identified similar diagnoses on June 24, 2013, and September 6, 2013. (*Id.* at 18.) The ALJ also noted that numerous medical examinations in the record indicated that Plaintiff had "normal strength, speed, dexterity, bulk and tone in both upper and lower extremities bilaterally." (*Id.* at 17–18.)

---

(Footnote Continued from Previous Page)
235, 260), shop (*id.* at 234, 260), watch television (*id.* at 236, 261), and travel to Japan for recreation (*id.* at 797). Patterns of daily living inconsistent with claims of pain diminish credibility. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) (stating that the ALJ properly discounted credibility where claimant "took care of his personal needs, washed dishes, changed sheets, vacuumed, washed cars, shopped, cooked, paid bills, drove, attended church, watched television, listened to the radio, visited friends and relatives, and read"); *see also Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995) (holding claimant's complaints of pain inconsistent with statements that he cooked breakfast, performed chores with help occasionally, visited friends and relatives, and attended church twice a month).

The fact that the ALJ did not mention Raynaud's disease by name does not render the ALJ's functional analysis insufficient. *See Collins ex. rel. Williams v. Barnhart*, 335 F.3d 726, 731 (8th Cir. 2003) ("Thus, the dispositive question remains whether [Plaintiff's] functioning in various areas is markedly impaired, not what one doctor or another labels his disorder."). The ALJ was aware of Plaintiff's claims of numbness in "the last couple fingers of [her] hand" (Tr. 38); however, the ALJ determined that the RFC restriction of "no more than occasional power gripping," consistent with Dr. Steiner's testimony, adequately reflected Plaintiff's actual functioning capacity and substantial evidence supports the ALJ's determination. (*See id.* at 16.)

### iii. Mental Examination Scores

Plaintiff argues that the ALJ failed to discuss her Patient Health Questionnaire ("PHQ-9") scores in determining her mental RFC. The PHQ-9 is a self-administered exam that aids in the diagnosis of depression severity.[8] As a self-administered exam, the PHQ-9 exam does not constitute a medical opinion which the ALJ must explicitly discuss. An ALJ is not required to discuss every piece of evidence. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."). Further, an ALJ's failure to discuss a specific piece of evidence does not indicate that the specific evidence went unconsidered. *Id.* Here, the ALJ referenced the Plaintiff's PHQ-9

---

[8]     Kurt Kroenke, *The PHQ-9: Validity of a Brief Depression Severity Measure*, National Center for Biotechnology Information, (Sept. 2001), http://www.ncbi.nlm.nih. gov/pmc/articles/PMC1495268.

scores during the hearing testimony, demonstrating that he was aware of them and, thus, that he considered them when discounting Plaintiff's credibility. (Tr. 42.)

Similarly, the ALJ gave adequate consideration to the Global Assessment of Functioning ("GAF") scores contained within the record. The ALJ noted the conflict between Plaintiff's lower GAF scores, higher GAF scores, Dr. Richmond's opinion, and Mr. Resemius's opinion and chose not to give controlling weight to the medical opinions. (*Id.* at 19.) GAF scores are not determinative, particularly where, as here, the record contains a range of scores. *See Juszczyk v. Astrue*, 542 F.3d 626, 632–33 (8th Cir. 2008) (holding ALJ's decision to discount GAF scores in light of contrary medical evidence was proper); *see also Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666–67 (8th Cir. 2003) (stating that ALJ's conclusion that the GAF scores assigned by treating providers did not reflect actual functional capacity was proper). Where there is conflict in the record, the ALJ's "determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). The ALJ considered both the positive and negative evidence and adequately explained his reasons for discounting that evidence. Substantial evidence supports the ALJ's decision.

### B. Treating Physicians

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Perkins*, 648 F.3d at 897. Accordingly, "[a] treating physician's opinion does not automatically control, since the record must be

evaluated as a whole." *Id.* A treating physician's opinion on whether a plaintiff is disabled is not entitled to deference since the Commissioner makes the ultimate decision regarding disability. *Id.* at 898. An ALJ may also discount a physician's opinion where it is based largely on a plaintiff's subjective complaints rather than objective medical evidence. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

Plaintiff argues that the ALJ failed to give appropriate weight to the medical opinions contained in the record and improperly discounted the opinions of her medical providers. Specifically, she asserts that the opinions of Dr. Richmond and Mr. Resemius were improperly discounted given the substantial length of time in which they treated her. (Pl.'s Mem. 42.) Plaintiff also argues that the ALJ failed to properly discuss the relevant factors in determining the weight to be given to a treating physician's opinion. (*Id.* at 41–42.) This Court concludes, however, that the ALJ's decision to afford little weight to the opinions of Dr. Richmond and Mr. Resemius is properly supported by substantial evidence in the record.

Notably, the ALJ pointed to a number of inconsistencies in the record in support of his determination. The ALJ considered the "mental status exams" present on numerous psychiatric progress notes, which indicated that the results of those examinations were within normal limits. (Tr. 771, 773, 775, 777, 779–80, 831, 834–35, 895.) The ALJ also considered Plaintiff's statements regarding changes in her medication regimen which resulted in improved daytime energy. (*Id.* at 921.) In addition, the ALJ relied on treatment notes that indicated Plaintiff was "well rested, well groomed and had good

hygiene," was "cooperative and alert," had normal language and concentration, and was oriented to "person, place and time." (*Id.* at 923–24.)

Though Plaintiff had reported to the emergency room due to concerns of depression and suicidal thoughts, on other occasions she denied suicidal thoughts and ideation. (*Id.* at 895, 956.) She exhibited thought processes that were organized and goal-directed. (*Id.* at 924, 956.) And her recent and remote memory were intact. (*Id.* at 924, 956.) Though Plaintiff was struggling with some difficulties, the ALJ correctly determined that Dr. Richmond's and Mr. Resemius's treatment records regarding Plaintiff's ability to sustain employment were inconsistent with their provided opinions, and he was therefore justified in affording them little weight. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (holding the ALJ properly reviewed the record as a whole and afforded treating physicians' opinions less weight due to inconsistencies in the record). Additionally, Dr. Richmond's opinion that Plaintiff could not "sustain work in any environment" and Mr. Resemius's opinion that it is "unlikely that Julie will be able to manage in a competitive work environment and maintain permanent employment" are entitled to no deference as opinions on residual function capacity.[9] *See House v. Astrue*,

---

[9] Furthermore, Mr. Resemius is a Licensed Associate Marriage and Family Therapist ("LAMFT"). (Tr. 971.) A LAMFT is not an acceptable medical source under Social Security regulations. *See* 20 C.F.R. § 404.1513(a)(1) ("We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment. Acceptable medical sources are . . . licensed or certified psychologists."); *see also* 20 C.F.R. § 404.1513(d)(1) ("In addition to the evidence from the acceptable medical sources listed in paragraph (a) . . . we may also use evidence from other sources[.]" "Other sources include, . . . medical sources not listed in paragraph (a) of this section (for example, . . . therapists).").

500 F.3d 741, 745 (8th Cir. 2007) (holding that a treating physician's opinions on a plaintiff's ability to engage in sedentary occupations were due no deference because they "invade[] the province of the Commissioner to make the ultimate disability determination"). The ALJ acknowledged Plaintiff's mental impairments when he noted "moderate difficulties in maintaining social functioning" and "moderate difficulties in maintaining concentration, persistence, or pace." (Tr. 14.)

Plaintiff also argues that the ALJ failed to discuss a number of factors in giving the treating physicians' opinions less weight. *See* 20 C.F.R. § 416.927(c)(2) ("When we do not give the treating source's opinion controlling weight, we apply the factors listed," including length, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors). An ALJ, however, is not required to discuss all evidence submitted, *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); he is only required to "give good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2). Here, the ALJ satisfied that requirement when he discussed the inconsistencies in the record.

Plaintiff argues that the ALJ did not mention or discuss the record established by Dr. Hillstrom and a number of other medical providers who were involved with Plaintiff. Normally, "[a]n ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). A treating physician's medical opinion is defined as "statements . . . that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis and prognosis,

what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

Here, the materials in the record provided by Dr. Hillstrom and the other medical providers do not constitute medical opinions as defined by the regulations. Plaintiff points to the record of her visits with Dr. Hillstrom, where Dr. Hillstrom noted that "[s]he has not been able to work for 2 years due to a weight lifting restriction of 10 [pounds] and the chronic pain," that she is taking "one to two Percocet six per day and has been using a few more," that "she is not sleeping well," and that she has been "taking more Percocet than she should." (Tr. 535, 537, 541.) Plaintiff points to similar complaints made to Drs. Vacca, Hernandez, and Nagargoje. But these notations occur during the *subjective* portions of the treatment notes in which Plaintiff is discussing the nature of the visit with her provider. *See Brown v. Apfel*, 221 F.3d 1341 (8th Cir. 2000) (holding ALJ properly discounted medical evidence where it was primarily based on self-reported symptoms).

Additionally, Plaintiff points to portions of Dr. Hillstrom's treatment notes in which Dr. Hillstrom states that Plaintiff "is on eight medications that act centrally on the brain all of which are known to cause drowsiness as a side effect," that she "is crying the entire time," and that she "looks very depressed." (Tr. 536, 568.) However, these statements, and others noted in Dr. Hillstrom's treatment notes, merely document the Plaintiff's complaints, appearance, and the medications prescribed to her. *See Moua v. Colvin*, 541 F. App'x 794, 797 (10th Cir. 2013) (holding that treatment notes that merely "document [patient] complaints and chronicle the pain medications and treatment [the physician] prescribed" offer "no pertinent medical opinion for the ALJ to weigh").

Because these notations and treatment notes do not constitute professional *judgments* about the nature and severity of the impairments, they do not constitute medical opinions as contemplated by the regulations.[10]

### C. Hypothetical

Plaintiff argues that the ALJ failed to propound a proper hypothetical to the vocational expert. (Pl.'s Mem. 44.) Specifically, Plaintiff argues that the ALJ failed to include her Raynaud's disease, balance, dizziness, blurred vision, restless leg syndrome, chronic sleep and fatigue issues, or inability to control her pain despite medication. (*Id.* at 45.)

A hypothetical posed to a vocational expert is sufficient where it "sets forth impairments supported by substantial evidence in the record and accepted as true." *Perkins*, 648 F.3d at 901–02. Thus, "'the ALJ may exclude any alleged impairments that he has properly rejected as untrue or unsubstantiated.'" *Id.* at 902 (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)). The hypothetical need not contain specific diagnostic terms used in medical reports and need only capture the concrete consequences of those impairments. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011).

---

[10] The ALJ clearly took into account Drs. Hillstrom's and Hernandez's treatment notes as part of his examination of the evidence as a whole. Though the ALJ did not reference either by name, he did directly reference treatment notes from both by date. (*See* Tr. 17, 566, 570, 574, 578, 796.)

Here, as previously discussed, the ALJ did not find Plaintiff's claims regarding the severity of her symptoms to be credible. As such, it was not necessary for the ALJ to include impairments that the ALJ did not consider sufficiently severe in his hypothetical to the vocational expert. *See Buckner*, 646 F.3d at 561 ("[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when there is no medical evidence that these conditions impose any restrictions on the claimant's functional capabilities or when the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment.") (internal quotation marks omitted).

### D. Additional Documents

Plaintiff argues that the case should be remanded so the ALJ may consider medical records that were not part of the original record. (Pl.'s Mem. 45.) The material includes records from Plaintiff's stay at a mental health unit from July 23 to July 29, 2013, and from September 3 to September 6, 2013. (*Id.* at 45–46.)

A court may remand for consideration of new evidence where there is good cause and the evidence is material. 42 U.S.C. § 405(g). "Material evidence is non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination." *Whitman*, 762 F.3d at 708 (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1025 (8th Cir. 2002)). The ALJ does have a duty to develop the record, but that duty is not "never-ending." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, it is not necessary to determine whether the additional evidence is material because Plaintiff has not demonstrated good cause for failing to submit those records during the underlying administrative proceeding. *See Hinchey v. Shalala*, 29 F.3d 428, 433 (8th Cir. 1994) (holding good cause lacking where plaintiff "had the opportunity to obtain [the] information . . . before the administrative record was closed but failed to do so without providing a sufficient explanation"); *see also Duncan v. Astrue*, Civ. No. 11-555 MJD/JSM, 2012 WL 763566, at *27 (D. Minn. Feb. 14, 2012), report and recommendation adopted, Civ. No. 11-555 MJD/JSM, 2012 WL 763559 (D. Minn. Mar. 7, 2012) (finding failure to show good cause fatal where plaintiff failed to explain why her previous attorneys could not have obtained the records earlier). Even assuming, however, that Plaintiff could demonstrate good cause for failing to obtain the records earlier in the process, remand would not be warranted as the records provided are duplicative of evidence already in the record.

As Plaintiff notes, the record already contains the admission and discharge summaries for both relevant time periods. (*See* Tr. 892–900, 920–28.) These summaries demonstrated to the ALJ the nature of Plaintiff's condition and her status on release. Because the record already contains evidence substantially similar to the proposed additional evidence, it is cumulative. *See Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994) ("[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."). Accordingly, this Court recommends affirming the ALJ's determination despite the select few missing medical records.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 20) be **DENIED**; and

2.     Defendant's Motion for Summary Judgment (Doc. No. 23) be **GRANTED**.


Date: July 16, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), a party may file and serve specific written objections to this Report and Recommendation by **July 30, 2015**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).